## GORMAN v. MADDEN et al

On dissolution of a partnership, the partner, who, in accordance with partnership agreement, advanced money for the business, is entitled, as against the other partners, to be repaid the same from the partnership assets.

. Where two of the partners drew out for their personal benefit
funds from the firm's bank account, the third partner; on an account-
ing after dissolution, is entitled to recover a third of such account
from the other partners' share of the partnership assets remaining,
or, in the absence of such assets, from them personally.

The partners, who overdrew the partnership account for their
personal benefit, are, in the absence of partnership assets to meet
the same, personally liable for the amount of the overdraft, on an
accounting after dissolution, to the other partner who alone repaid
the bank.

There being no evidence that the apparent overdraft in a firm's
bank account, when one of the partners left the business in the
hands of others, represented any partnership. loss, and was not met
by deposits with the bank's eastern correspondent of the proceeds of
stock shipped east by the firm, as in the ordinary course of business
it would be, the other partners were not entitled to be credited as
against their partner, on a final accounting, with the amount of
such apparent overdraft on the final overdraft, all the rest of which,
at least, represented a misappropriation by them.

That among the checks of the partners, with whom a firm's
business was left by the partner, which checks created an overdraft
of the firm's bank account, was one for the amount of the purchase
price of a horse bought for the firm before the settlement of the
previous year's business, does not show that the horse was paid for
with such check, so as to entitle such partners to credit therefor on
an accounting with their partner; the balance of the overdraft, at
least, being a misappropriation by them.

Though the answer, in action by one of the partners against the
others for an accounting of the affairs of the firm of M. & G., en-
gaged in buying and selling live stock, alleges that during the course
of said partnership plaintiff engaged in a business "contrary to the
provisions of this said partnership," yet it alleging that he "bought
and sold live stock as such partner," from which business he has
made profits of which he has made no accounting to defendants, de-
fendants may thereunder show that plaintiff, as representative of
the firm of M. & G., under an agreement between the members
thereof that he should do so, engaged in such other business as
partner with others; so that the firm of M. & G. was entitled to his
share of the profits in such other business.

(Opinion filed April 28, 1911.)

Appeal from Circuit Court, Hamlin County. Hon. GEORGE
H. MARQUIS, Judge.

Action by J. K. Gorman against P. H. Madden and another.
From a judgment for plaintiff, and from an order denying a new
trial, defendants appeal. Reversed.

See, also 26 S. D. 459, 128 N. W. 614.

*Hanten & Hanten* and *E. W. McLaughlin,* for appellants.
*M. J. Russell,* for respondent.

WHITING, J.   This action was brought by the plaintiff to procure an accounting of partnership affairs in a partnership alleged to have been existing between plaintiff and the defendants. In his complaint the plaintiff alleged the creation of the partnership under the name of Madden & Gorman; that it had done business for some time; that it had certain assets, part of which were in the possession of the defendants; that there were further assets, the nature of which were to plaintiff unknown; and the wrongful overdrawing of moneys by the defendants from the bank through which the partnership did its business. An accounting was sought, and decree asked adjudging that the plaintiff have a lien against the partnership assets for the amount found due him on such accounting, and a personal judgment for any deficiency remaining.   Prior to the trial, that part of the complaint setting forth the overdrawing of moneys from the bank was stricken out on the motion of the defendants, thus leaving the questions relating to such wrongful withdrawals of funds, if any there were upon the part of the defendants, to be determined under the general prayer for the accounting.   The defendants, answering, admitted the partnership; and, by way of counterclaim, alleged, among other things, the following: "That during the course of said partnership (and prior to on or about November 5, 1906), * * * the said plaintiff engaged in a business contrary to the provisions of this said partnership, and bought and sold live stock as such partner, from which business the said plaintiff received a large profit, the exact amount of which is unknown to the defendants; * * * that the plaintiff has made no accounting of the same to the defendants, although due demand has been made therefor."   And the defendants asked for an accounting which should include this matter above referred to.   The cause was tried before a referee, who reported findings of fact and conclusions of law in favor of the plaintiff, which findings and conclusions were adopted by the trial court, and, motion for new trial having been

denied, the defendants have appealed to this court from the judgment which had been entered upon such findings and conclusions, and from the motion denying a new trial.

It appears that, in the year 1902, the parties to this action entered into a partnership agreement, under and by virtue of which the plaintiff was to furnish for the use of the partnership $1,000, or such further sum as he might add thereto from time to time, and that, against the use of this money, the defendants were to put in their time and labor, and the profits and losses were to be shared equally. This partnership was created for the purpose of engaging in the business of buying and selling live stock; the chief place of business being at Castlewood, in this state. This business was carried on until the summer of 1906, during which time the partnership had cleared profits each year prior to said year 1906, and had, prior to such year, invested some of its assets in real estate. The year ending in June, 1906, had been unprofitable, and it appears that in June, when the partnership made its yearly settlement, in order to properly segregate the business of the preceding year from that to follow, the firm opened up a second and separate account at the bank. It clearly appears from the evidence that the business of this firm, so far as the shipping and selling of live stock was concerned, was carried on in the following manner: Upon a sale of live stock to a purchaser in the Eastern market, the money therefrom would be deposited in the bank that was the Eastern correspondent for the Castlewood bank with which defendants did business. This Eastern bank would credit the Castlewood bank, and, upon receiving the report thereof, the Castlewood bank would credit the partnership. It appears that, at the time this second account was started, it was the understanding that the old account at the bank was to be balanced up from returns received from the business of the preceding year, which had not yet been entirely closed. It was the evident purpose to keep the prior year's business separate from the business to follow. It appears that, from the business of the preceding year, there was eventually left in the bank a surplus of $202.92, which surplus was then carried into the new account and credited to said firm.

It is undisputed that the plaintiff advanced for the use of the firm, from time to time, large sums of money, and that the sum of $1,000 has never been repaid to him; and there can be no question but that, under the partnership agreement, the plaintiff, upon dissolution of the partnership, was entitled to be reimbursed for the same out of the partnership assets. Commencing in August, 1906, the plaintiff was away from his home and engaged in the stock business with headquarters at Ft. Pierre, S. D., and, during his absence, the defendants drew a large amount of money from the Castlewood bank upon partnership checks resulting in a very large overdraft of the partnership account. No satisfactory explanation of the reasons for drawing such money appears. It is evident that few purchases were made by the defendants on behalf of such partnership after about the 1st of August, although it is shown that the money drawn from the bank by said defendants was used largely in the purchase of live stock, which defendants converted to their individual uses. The only attempt at justification of their conduct by the defendants was their claim that they believed plaintiff to be making large profits in his business at Ft. Pierre, and that they were entitled to share in the same; they evidently taking this method of playing even with the plaintiff. There is no pretense upon the part of the defendants that after the 1st of August, 1906, and until the time of bringing this action, they lost any money in partnership ventures, and, upon the other hand, there is nothing to show any profits made by them from the stock purchased with money drawn from the partnership account in which profits plaintiff would be entitled to share; but it does appear that, as a result of their wrongful drawing of money from said bank, there was created an overdraft at said bank in the sum of $2,382.72, which said overdraft was paid by the plaintiff on November 23, 1906.

It will thus be seen, from what has been stated above, that, disregarding any claims the defendants might have against the plaintiff growing out of the business at Ft. Pierre, the plaintiff would be legally entitled to recover from the defendants upon an accounting as follows:

[1] First. He would be entitled to withdraw from the assets of the partnership, if such assets had consisted of cash, the sum of $1,000 to reimburse himself for the cash advanced for the business, and, there being no cash assets, he would be entitled, as against the defendants, upon sale of the partnership assets, to be paid therefrom the sum of $1,000.

[2] Second. So far as the sum of $202.92 was concerned, which sum went into the so-called "new account," it was partnership funds in which the defendants had a two-thirds interest. This $202.92 having been afterwards misappropriated by the defendants, the plaintiff was entitled to recover, either from the defendants' share of the partnership assets remaining after the payment of the $1,000, or else from the defendants personally the one-third of said $202.92 or $67.64.

[3] Third. So far as the $2,382.72 was concerned—there being no claim that the same or any part thereof was lost through partnership transactions (except as hereinafter mentioned), and the same representing money wrongfully drawn, but not from partnership assets on deposit in the bank, but representing an overdraft upon such bank which overdraft has been met solely by the plaintiff—the defendants are personally liable to the plaintiff for the whole of said amount, with the right on the part of the plaintiff to be repaid therefor from the defendants' share of any assets remaining after the payment of said $1,000 and said $67.64, and plaintiff is entitled to a personal judgment against the defendants for any deficiency.

For some reasons, unknown and unexplained to this court, the findings, conclusions, and the judgment in the trial court make no account whatsoever of the said $1,000 or the said $202.92, and plaintiff has received no credit for the same upon the accounting; but, inasmuch as the plaintiff has not appealed from the judgment herein, this fact would not be given any attention if it were not that, under the views of this court, a new trial must be granted, and we think it proper to indicate our views in regard to those items.

By the findings, conclusions, and judgment herein the plaintiff was adjudged to recover the $2,382.72 from the defendants,

and was declared to have a lien upon their share of the partnership assets to secure the same with the right to personal judgment for any deficiency. The appellants contend that such judgment is excessive, claiming that the appellants are entitled to a credit for the amount of an overdraft at the bank existing on August 6, 1906, being about the time when plaintiff left for Ft. Pierre; it being the claim that such overdraft represented the true and legitimate status of the business at that time, and which overdraft existed after crediting the new account with the $202.92. They also contend that the purchase price of a horse, now a part of the partnership assets, is a part of such overdraft and should be deducted therefrom.

[4] It is true that, by striking a balance upon the books at the bank on August 6th, it showed an overdraft for a considerable sum, and, if such overdraft had been the result of losses suffered from partnership business, the amount thereof should have been deducted from the final overdraft and defendants held liable for the difference. There is absolutely no proof that such overdraft represented any loss, and it is readily seen that, in such a business as buying stock to ship to Eastern markets, the conditions of the firm's account at the bank upon any date is, standing alone, no evidence of either profit or loss, be that account never so large or small. To show the fallacy of appellants' contention, we need only call attention to the fact that from August 7th to 15th checks were drawn on the bank, presumably for stock purchased, in the total of only $416.65, part of which was drawn too late to be for stock thereafter shipped to Chicago with time for returns to be reported to the bank by August 15th. Yet we find that on August 15, 1906, the bank credited the firm, upon a report from their Chicago representative, with the amount of $830.83, the larger part of which must undoubtedly represent stock sold, checks for the purchase of which helped to create the overdraft on August 6th. By striking a balance of the books at the bank, it would show a balance to the credit of the firm of $176.08 on August 15, 1906. The referee and trial court were clearly right in holding appellants liable for the whole overdraft, in the absence of any proof to

show that any part of the same represented other than absolute misappropriation of the funds of the firm, and they should have been held for the $202.92 as well for the same reason.

[5] As regards the horse, it is conceded that such horse was purchased in the month of May, 1906, prior to the time when settlement of the year's business was made; and, while it is claimed that the horse was not paid for until afterwards, the defendants wholly failed to prove any facts justifying the referee to find that said horse was paid for out of money represented by the final overdraft. The mere fact that one of the checks creating such overdraft, drawn several months after May, chanced to be in the amount of the alleged purchase price of said horse, was entitled to no weight as proof that such check paid for that horse, in view of the fact that the stub of such check, which had always been in the possession of the defendants, was not produced by them and had undoubtedly been destroyed, and of the further fact that the check was not in evidence and there was no oral proof connecting this check with the purchase of such horse.

[6] We come now to the question of the Ft. Pierre business. It is the claim of the defendants and appellants that there was an agreement entered into between the parties to this action, whereby the plaintiff and the defendants, as a part of their partnership business, were to seek a partnership with certain parties named Brown & Sorenson, for the purpose of engaging in the purchase and sale of sheep in the country tributary to Ft. Pierre; and it is the contention of the defendants that the plaintiff afterwards entered into a business arrangement with Brown & Sorenson, under which he engaged in the said business of purchasing and selling sheep, and in which he made large profits. Defendants offered, and there was received in evidence, some testimony tending to show that there was such an agreement between the parties to this action, whereby they were to seek a partnership with Brown & Sorenson in the sheep business. The defendants sought to show through witnesses Brown & Sorenson that the plaintiff did, on behalf and in the name of the partnership existing between plaintiff and defendants, enter into a partnership with Brown & Sorenson, and

they offered testimony to show the profits received by plaintiff from such business. The testimony of Brown & Sorenson upon these points was excluded over the objections and exceptions of the defendants. It is the contention of the respondent that such rulings were correct under that part of the answer which we have quoted above; he contending that by the allegations of such answer, the defendants relied upon the claim that respondent had engaged in this Ft. Pierre business, "contrary to the provisions of this said partnership," and that therefore evidence to prove that his engaging in this business was in accordance with his partnership agreements was inadmissible under such pleadings. It will be noted, however, that in said answer it was alleged that plaintiff "bought and sold live stock as such partner." It appears to us that the referee should have received the evidence offered, much of which was certainly proper in form, competent, and material as tending to prove that a partnership was entered into by respondent on behalf of the partnership of Madden & Gorman, in which such firm was to share equally with Brown & Sorenson; at least much of this evidence was competent as tending to corroborate the evidence of the defendants to the effect that there was an agreement between the members of the firm of Madden & Gorman that such a business arrangement with Brown & Sorenson should be effected.

We think it must be conceded that, if the members of the firm of Madden & Gorman entered into an agreement among themselves whereby they undertook to extend the business in which they were engaged by engaging therein with other parties in a new territory, and afterwards one of their firm should engage in such business with such other parties, such partner would be liable to the firm for the profits received from such business, even if he did not enter into the new partnership in the name and on behalf of the old; so that, as bearing upon the question of whether or not there was such an agreement entered into between the parties to this action, the evidence offered and excluded was competent and material, and, inasmuch as the evidence concerning such an agreement was directly conflicting, this court cannot de-

termine what probative force there would have been, in the mind of the referee or trial court, in the evidence excluded, and cannot determine whether or not, if such evidence had been considered by the referee, he would have reached the same conclusions as he reached with such evidence excluded; and, inasmuch as it appears that, if respondent was liable to share with appellants the profits from the Ft. Pierre business, the amount to which the defendants would be entitled would be considerably in excess of the amount for which the referee and court failed to give the plaintiff due credit, and that therefore the allowance of appellants' claim against the respondent would necessarily decrease the amount of the judgment herein—it appears that the judgment and order denying a new trial should be reversed.

HANEY, J. (dissenting). The following declarations of the Revised Civil Code relating to the law of partnership, in connection with the maxim, "he who consents to an act is not wronged by it" (Rev. Civ. Code, § 2414), are applicable to the case at bar:

"Sec. 1743. All profits made by a general partner in the course of any business usually carried on by the partnership, belong to the firm.

"Sec. 1744. A general partner who agrees to give his personal attention to the business of the partnership, may not engage in any business which gives him an interest adverse to that of the partnership, or which prevents him from giving to such business all the attention which would be advantageous to it.

"Sec. 1745. A partner may engage in any separate business, except as otherwise provided by the last two sections.

"Sec. 1746. A general partner transacting business contrary to the provisions of this article, may be required by any copartner to account to the partnership for the profits of such business."

The Gorman & Madden partnership being engaged in the live stock business at Castlewood, if plaintiff engaged in the same business at Ft. Pierre without his copartners' consent, they might be entitled to participate in his profits; but if he engaged in such business on his individual account, with their consent, they would not be entitled to an accounting. Having proved by their own

testimony that plaintiff engaged in the Ft. Pierre business, after notice to them and without objection on their part, defendants attempted to prove that such business was conducted by a partnership consisting of Brown, Sorenson, the plaintiff, and themselves. Evidence tending to prove the existence of such a partnership was properly excluded or disregarded by the referee. It was irrelevant. It tended to prove a fact not alleged in the answer—a fact not only inconsistent with, but diametrically opposed to, the averment therein that the "plaintiff engaged in a business contrary to the provisions of" the Gorman & Madden partnership, which means, if it means anything, that plaintiff engaged in such business against the objection or without the consent of his copartners. Clearly, such an averment is not consistent with the theory that plaintiff was acting for and on behalf of the defendants as a member of the Ft. Pierre partnership of which they also were members.

Having discovered no error prejudicial to the defendants, I think the judgment of the circuit court should be affirmed.